## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ERIC RAVENELL,

     Plaintiff,

     v.

ALEJANDRO N. MAYORKAS, Secretary,
Department of Homeland Security,

     Defendant.

Civil Action No. 22-3548 (JDB)

## MEMORANDUM OPINION

Plaintiff Eric Ravenell, a longtime employee of the U.S. Department of Homeland Security, was detailed from Washington, D.C. to Baltimore following a June 2019 altercation with his former supervisor. He sued Secretary of Homeland Security Alejandro Mayorkas in his official capacity ("DHS"), asserting claims of race, sex, and disability discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. Before the Court is DHS's motion to dismiss Ravenell's complaint or, alternatively, for summary judgment. For the reasons that follow, the Court will deny the motion to dismiss as to Ravenell's claims of race and sex discrimination based on the detail and as to his hostile work environment claim, but will grant it as to his remaining claims.

## Background

### I.   Factual Background

The following facts are drawn from "the facts alleged in the complaint, . . . documents either attached to or incorporated in the complaint, and matters of which the court may take judicial

notice." <u>Gun Owners of Am., Inc. v. Fed. Bureau of Investigation</u>, 594 F. Supp. 3d 37, 42 (D.D.C. 2022) (quoting <u>Galvin v. Del Toro</u>, 586 F. Supp. 3d 1, 8 (D.D.C. Feb. 18, 2022)).

Eric Ravenell is a Black man and the father of a son with Type 1 diabetes.  Compl. [ECF No. 1] ¶ 13.  He has worked at Immigration and Customs Enforcement ("ICE") within the Department of Homeland Security since 2004.  <u>Id.</u> ¶ 18.  Between November 2015 and October 2019, Ravenell worked in the Enforcement and Removal Operations section of the Custody Management Division of ICE's Juvenile and Family Residential Management Unit ("JFRMU"). <u>Id.</u> ¶ 19.  He worked out of ICE's Washington, D.C. office for most of this period.  <u>See id.</u> ¶¶ 14, 42.  Beginning in late 2017, Ravenell's first-line supervisor (i.e., his direct boss) was Unit Chief Mellissa Harper, a white woman.  <u>Id.</u> ¶¶ 20, 22.  His second-line supervisor was Deputy Executive Associate Director Deane Dougherty, also a white woman, and his third-line supervisor was Tae Johnson, who later became ICE's Acting Director.  <u>Id.</u> ¶ 20.[1]  Ravenell's allegations in this suit primarily concern his relationship with Harper.  <u>See</u> Compl. ¶ 21.

In November or December 2017, Harper began requiring Ravenell to come into work on Friday, which had been his scheduled telework day.  <u>Id.</u> ¶ 22.  He did not meet the criteria for a revocation of telework privileges; Harper's proffered explanation for the change was that "she needed to be able to see her staff because that was what she had been used to in [her prior posting] and that telework did not work for her."  <u>Id.</u>; <u>see id.</u> ¶ 23.  Ravenell was the only direct report treated in this way.  <u>Id.</u> ¶ 22.

In January 2018, Harper made comments about two of Ravenell's coworkers who were also men of color.  <u>See id.</u> ¶¶ 24–25.  During a conversation with Ravenell, she referred to a coworker as "Kim Jong-Un."  <u>Id.</u> ¶ 24.  In another conversation, she stated that a different coworker

---

[1] Ravenell's complaint does not include Johnson's race or sex, but DHS asks the Court to take judicial notice of the fact that Johnson is a Black man.  <u>See</u> Def.'s Mot. to Dismiss or for Summ J. [ECF No. 6] at 1–2.

(a Black man) had killed someone in a government vehicle.  Id. ¶ 25.  Ravenell informed her "that that was untrue" because, while a woman did indeed die after a collision with the coworker's vehicle, "the deceased woman was found at fault."  Id.  Harper "rarely, if ever" made similar "derogatory comments . . . about any of the women employees in the office."  Id. ¶ 24.

On November 27, 2018, Harper was in Texas for a work meeting.  Id. ¶ 26.  After apparently going to the wrong address, she texted Ravenell that "the f****** address on the fact sheet is wrong."  Id.  Ravenell responded that that address was the only one on file, to which Harper responded "we'll [sic] google it."  Id.

On December 6, 2018, Ravenell participated in a telephone meeting led by Harper about how to improve a training.  Id. ¶ 27.  Also present were various stakeholders from outside the JFRMU.  Id. ¶ 27–28.  Ravenell advised Harper that his team had made significant changes to the training based on survey feedback, and that it would be best to have their scheduled meeting with her to address these changes before soliciting input from external stakeholders.  Id. ¶ 27.  Harper rejected this suggestion, stating that she already had these stakeholders present and wanted their input.  Id.  As the external stakeholders continued to criticize the training, Ravenell reiterated his recommendation.  Id. ¶ 28.  Harper then told Ravenell that he could get off the call, which he did.  Id.  After the meeting, Harper emailed Ravenell asking him to call her.  Id. ¶ 29.  When he did, she asked him "what his problem was."  Id.  He asked her the same thing, noted that his team had been working hard on the training, and expressed his frustration that she had allowed external stakeholders to critique the training before he had a chance to discuss the proposed changes with her.  Id.  She responded, "I didn't know."  Id.

Around March 8, 2019, Ravenell scheduled about a week of leave because his significant other was going out of town and he needed to be home to provide childcare.  Id. ¶ 30.  Harper

called him and "asked him about [this] leave and whether his attendance was going to become an issue." Id.

On March 27, 2019, Harper spoke with Ravenell regarding her adopted Black son's desire to go to a historically black college or university. Id. ¶ 31. She said her son wanted to attend Savannah State University, but she did not think it was a good idea because it was "not real life." Id. She then "either referred to the school as ghetto or the area in which it was located as ghetto and not a pleasing environment." Id.

In May 2019, Ravenell became aware that Harper had told a coworker that "[Ravenell] and his girlfriend were not together when she became pregnant." Id. ¶ 32. This was not true, and Ravenell had never discussed this information with Harper. Id. Ravenell viewed the comment as perpetuating stereotypes about Black men. Id.

Around this time, Harper began pushing Ravenell to apply to positions outside of JFRMU. Id. ¶ 33. On May 17, 2019, she suggested that Ravenell apply for a job in Baltimore. Id. She also asked if he would take a job as a deportation officer in the field and suggested that she could reach out to the relevant director on his behalf. Id. Ravenell had not sought to move positions or asked for Harper's help in doing so, and he declined this offer. Id.

On June 14, 2019, Harper asked Ravenell "if he was in a fraternity and if he had brands." Id. ¶ 34. Ravenell responded that he had several, and Harper asked if "he was concerned about what people thought." Id. Ravenell asked what she meant, and Harper responded, "[Y]ou know it has a slave connotation." Id. Ravenell replied that "people can think what they want but it was a personal choice." Id. Harper then stated that "she didn't want her son to join any organization where he would have to be subjected to it." Id.

Later that day (a Friday), Ravenell requested sick leave for that afternoon and for Tuesday, June 18.  Id. ¶ 35.  Harper called and asked about the purpose of the leave.  Id.  Ravenell informed her that he picked up his son on Fridays and wanted to be home in time to keep up this routine.  Id.  Harper noted the Tuesday leave and asked if it was also for Ravenell's son.  Id.  Ravenell answered in the affirmative, to which Harper asked, "What's wrong with him now?"  Id.  Ravenell said he did not want to talk about it.  Id.

On June 20, 2019, the next Thursday, Ravenell informed Harper that he and his team were encountering problems related to an impending deadline.  Id. ¶ 36.  Harper grew upset and told him that there was no extension and that the task needed to be completed by close of business on Friday, because "she was the person who had to sign the declaration and she was not going to answer to the Department of Justice . . . or the courts for it not being done."  Id.  Ravenell responded that he was working on it diligently but might not meet the deadline due to "system errors."  Id. ¶ 37.  Harper replied, "You have [Administratively Uncontrollable Overtime], get it done."  Id.  Ravenell then observed, "You can't get blood from a turnip; how do you expect us to complete a task when the system was not available last night and has been experiencing outages and has been operating ineffectively all morning?"  Id.  When Harper continued to insist that the task had "better be done," Ravenell told her that he had only gotten the relevant information the day before (i.e., that Wednesday).  Id. ¶ 38.  Harper began to walk away, stating, "That's not my problem, why did you just get it yesterday?"  Id.  Ravenell responded, "You're not going to do that, let's finish this in your office."  Id.

In Harper's office, Ravenell told her, "You will not do that; you will not make me feel guilty for taking my son to the doctor on Tuesday.  You were out of line."  Id. ¶ 39.  He then reminded Harper of their call on Friday, June 14, when he told Harper that he would be taking

leave on Tuesday to care for his son and when she asked "What's wrong with him now?"  Id.
Harper responded, "I did not say that.  If I did, I was wrong."  Id.  Ravenell started to walk out of
Harper's office, at which point Harper "yelled to him that he was being juvenile."  Id. ¶ 40.  He
turned around, walked back into the office, and closed the door.  Id.  He "adamantly" reiterated to
her that "she would not make him feel like taking time off to take care of his son was wrong."  Id.
Harper "told him to take his finger out of her face and reached over and grabbed his finger, though
he was more than an arms-length away from [her] at that time and his finger was not in her face."
Id.

After leaving Harper's office, Ravenell contacted Deane Dougherty, his second-line
supervisor.  Id. ¶ 41.  He discussed the situation with her "to the best of his abilities[,] as he was
emotionally overwrought."  Id.  Harper contacted Dougherty separately to provide her version of
events, telling Dougherty that she "felt she should have been concerned for her safety."  Id. ¶ 42.
As a result of Harper's statement, Dougherty and Tae Johnson (Ravenell's third-line supervisor)
decided to detail Ravenell to ICE's Baltimore office.  Id.  Dougherty informed Ravenell that this
detail was not an adverse action.  Id.

At some point in October 2019, Ravenell transferred out of JFRMU to another ICE
division.  See id. ¶¶ 18–19.  Around October 14, another individual was chosen for an open JFRMU
Section Chief position.  Id. ¶ 43.  Ravenell had not applied for this position.  See Pl.'s Opp'n to
Mot. [ECF No. 8] ("Opp'n") at 25.

The June 2019 altercation between Ravenell and Harper spawned two administrative
inquiries.  The first was an internal investigation.  See id. ¶ 44.  Following this investigation,
Ravenell was served with a proposed notice of a five-day suspension on August 13, 2021, which

he disputed.  Id.  On December 3, 2021, Ravenell received a final letter of decision informing him

that a formal letter of reprimand would be placed in his personnel file in lieu of a suspension.  Id.

The second inquiry was an Equal Employment Opportunity Commission ("EEOC")

process initiated by Ravenell.  On July 1, 2019, Ravenell reached out to an Equal Employment

Opportunity ("EEO") counselor for informal counseling.  See Ex. A to Def.'s Mot. to Dismiss

[6-2] ("EEOC Compl.") at *2.  On November 14, 2019, he filed a complaint with the EEOC.  Id.

at *1.  An EEOC Administrative Judge rejected Ravenell's claims, and Ravenell learned of this

decision on August 23, 2022.  See Compl. ¶ 8.

## II.  Procedural History

Ravenell filed the present action against DHS on November 21, 2022.  Compl. at 24.  His

complaint asserts five counts: race discrimination (Count One), sex discrimination (Count Two),

hostile work environment (Count Three), and retaliation (Count Four), all in violation of Title VII,

as well as disability discrimination and failure to accommodate in violation of the Rehabilitation

Act (Count Five).  See id. ¶¶ 49–122.  He seeks $500,000 in compensatory damages as well as

declaratory and injunctive relief.  Id. at 23–24.

DHS moved to dismiss the complaint or, in the alternative, for summary judgment.  See

Def.'s Mot. to Dismiss or for Summ J. [ECF No. 6] ("Mot.").  DHS's principal arguments are that

Ravenell did not administratively exhaust various claims and fails to plausibly allege others.  But

DHS also proffers various materials from the EEOC proceedings and argues that "[t]o whatever

extent any of [DHS's] arguments cannot be resolved on a motion to dismiss, summary judgment

is not premature."  Reply in Supp. of Mot. [ECF No. 10] ("Reply") at 19.

Ravenell opposed DHS's motion, see Opp'n, and DHS filed a reply, see Reply.  The motion

is thus fully briefed and ripe for decision.

## Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In deciding such a motion, courts must generally "accept the [complaint's] factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Sanchez v. Off. of State Superintendent of Educ., 45 F.4th 388, 395 (D.C. Cir. 2022).  Courts need not, however, accept "legal conclusions, legal contentions couched as factual allegations, [or] unsupported factual allegations" in the complaint, Gulf Coast Mar. Supply, Inc. v. United States, 867 F.3d 123, 128 (D.C. Cir. 2017), nor must they "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice," Scahill v. District of Columbia, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (internal quotation marks omitted).

## Analysis

### I.   Title VII Claims

"Title VII of the Civil Rights Act of 1964 reflects the American promise of equal opportunity in the workforce and shields employees from certain pernicious forms of discrimination."  Jackson v. Modly, 949 F.3d 763, 767 (D.C. Cir. 2020) (internal quotation marks omitted).  As originally enacted, the statute did not apply to the federal government.  Id.  However, Congress extended Title VII's protections to federal employees in the Equal Employment Opportunity Act of 1972, Pub. L. No. 92–261, § 11, 86 Stat. 103, 111-13.  Title VII now provides, as relevant here, that "[a]ll personnel actions affecting employees or applicants for employment . . . in [federal] agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-16(a).

Ravenell brings four sets of claims under this provision: claims for race discrimination, sex discrimination, a hostile work environment, and retaliation.  The Court will first consider whether Ravenell has administratively exhausted these claims, and then consider the merits of each in turn.

### A.  Administrative Exhaustion

"Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court."  Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (cleaned up).  The administrative exhaustion process is governed by regulations promulgated by the EEOC and has two principal steps.  First, "[a]ggrieved persons who believe they have been discriminated against . . . must consult [an EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter."  29 C.F.R. § 1614.105(a).  The "aggrieved person must initiate contact with [the] Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  Id. § 1614.105(a)(1).  If the counseling process is unsuccessful, the employee must then timely file a formal EEOC complaint with his agency employer.  Id. § 1614.106(a).  This EEOC complaint must generally include claims that the employee seeks to later press in litigation.  See Hamilton v. Geithner, 666 F.3d 1344, 1350 (D.C. Cir. 2012).  If the agency denies relief or fails to take timely action, the employee may then sue in federal court.  See 29 C.F.R. § 1614.407.  These exhaustion requirements are non-jurisdictional claims-processing rules.  See Bain v. Off. of Att'y Gen., 648 F. Supp. 3d 19, 46 (D.D.C. 2022) (citing Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997)); see also Manrique v. United States, 581 U.S. 116, 121 (2017) (noting that such rules are subject to forfeiture, but if properly invoked are "unalterable" (internal quotation marks omitted)).

Here, DHS contends that Ravenell failed to exhaust various of his Title VII claims by (1) not timely contacting an EEO counselor, (2) not checking the box for "retaliation / reprisal" claims

in his EEOC complaint, and (3) not filing a subsequent EEOC complaint to capture events that occurred after he filed the first.  See Mot. at 8–10.  The Court credits the first and third arguments but rejects the second.

The requirement to contact an EEO counselor within forty-five days of the allegedly discriminatory matter is "an important one," as a "court may not consider a discrimination claim that has not been exhausted in this manner absent a basis for equitable tolling."  Howard v. Kerry, 85 F. Supp. 3d 428, 433 (D.D.C. 2015) (quoting Steele v. Schafer, 535 F.3d 689, 693 (D.C. Cir. 2008)).[2]  Ravenell first contacted an EEO counselor on July 1, 2019, shortly after his altercation with Harper.  See EEOC Compl. at *2; see also Compl. ¶¶ 36–40.[3]  Accordingly, he did not timely contact an EEO counselor with respect to any discrete incidents that occurred before May 17, 2019.  This includes Harper's alleged alteration of his telework privileges as well as her alleged inappropriate comments and criticism that occurred prior to that date.  See Compl. ¶¶ 22–31.

There is a wrinkle—albeit not one raised by Ravenell, who offers no response to DHS's exhaustion arguments on this point.  See Opp'n at 12–13.  Historically, the D.C. Circuit permitted Title VII plaintiffs to assert unexhausted claims so long as they were "like or reasonably related to the allegations" in the EEOC complaint.  Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted).  On that theory, the earlier acts Ravenell alleges were discriminatory could be actionable so long as "like or reasonably related" to the allegations in his EEOC complaint.  But the Supreme Court's decision in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), casts serious doubt on the continued validity of this approach.

[2] Ravenell has not argued that he is entitled to equitable tolling of the deadline.  See Foster v. Gonzales, 516 F. Supp. 2d 17, 26 (D.D.C. 2007); 29 C.F.R. § 1614.105(a)(2).

[3] The Court can properly consider Ravenell's EEOC complaint at the motion-to-dismiss stage.  This administrative complaint is incorporated by reference into Ravenell's present complaint, is "integral to [Ravenell's] exhaustion of administrative remedies," and is also a "public record[] subject to judicial notice."  Laughlin v. Holder, 923 F. Supp. 2d 204, 209 (D.D.C. 2013); see also Compl. ¶ 7.

Morgan held that "discrete discriminatory acts are not actionable [under Title VII] if time barred, even when they are related to acts alleged in timely filed charges." Id. at 113. It emphasized that each individual act of discrimination "constitutes a separate actionable 'unlawful employment practice,'" and that each act "starts a new clock for filing charges alleging that act." Id. at 113–14. And while Morgan specifically concerned the timing requirements to file an EEOC complaint, courts have understood its logic to undermine the "like or reasonably related to" standard as applied to exhaustion more broadly, including with respect to timely contact with an EEO counselor. See id. at 104–05; Bain, 648 F. Supp. 3d at 45.

The D.C. Circuit has repeatedly reserved on the question whether Park's "like or reasonably related" test has been displaced by Morgan. See, e.g., Webster v. Del Toro, 49 F.4th 562, 568 (D.C. Cir. 2022); Haynes v. D.C. Water & Sewer Auth., 924 F.3d 519, 526 n.1 (D.C. Cir. 2019); Payne, 619 F.3d at 121. But most judges in this District have answered that question in the affirmative. See Bain, 648 F. Supp. 3d at 45; see also Rashad v. Washington Metro. Area Transit Auth., 945 F. Supp. 2d 152, 166 (D.D.C. 2013) (collecting cases). And this Court has previously concluded that, after Morgan, a plaintiff "must establish that he timely exhausted his administrative remedies for each discrete claim of [discrimination or] retaliation." Keeley v. Small, 391 F. Supp. 2d 30, 40–41 (D.D.C. 2005).[4] Ravenell has given this Court no reason to reconsider that prior determination. Accordingly, the Court concludes that Ravenell has failed to exhaust any claims based on discrete discriminatory acts that occurred prior to May 17, 2019.

Two important caveats. Ravenell may still point to these prior incidents "as background evidence in support of a timely claim." Morgan, 536 U.S. at 113. And he may rely on them for

---

[4] This Court did not specifically cite Park in its Keeley decision, but concluded more broadly that the pre-Morgan case law had been "undermined." Keeley, 391 F. Supp. 2d at 40. In a later decision, this Court noted the Park-Morgan issue but ruled on an alternative basis. See Howard, 85 F. Supp. 3d at 433–34.

purposes of his hostile work environment claim, because such a claim is "different in kind from [claims based on] discrete acts" as its "very nature involves repeated conduct." Id. at 115. "Provided that an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117. That is the case here. See Compl. ¶¶ 32–35.

The Court now turns to DHS's second exhaustion argument. In his EEOC complaint, Ravenell checked the boxes for discrimination based on "race," "color," "sex," "physical or mental disability," and "parental status," but did not check the box for "retaliation / reprisal." EEOC Compl. at *2. DHS contends that this failure necessarily dooms Ravenell's retaliation claims. See Mot. at 9–10. Ravenell counters that, while he did not check the appropriate box, he referenced a potential retaliation claim in a document attached to the complaint specifying his requested remedies. See Opp'n at 12–14. He points to the following remedial request: "Retraction of email sent on June 21, 2019 by . . . Dougherty that resulted in an adverse action and retaliation based on the June 20, 2019 incident . . . ." EEOC Compl. at *3.

"Attachments to a formal EEO complaint are an integral part of the complaint and can independently identify claims for resolution." Crawford v. Duke, 867 F.3d 103, 107–08 (D.C. Cir. 2017). And EEOC complaints "are to be construed liberally since very commonly they are framed by persons unschooled in technical pleading." Id. at 108 (internal quotation marks omitted). Accordingly, courts have found claims exhausted based on narrative descriptions included in an EEOC complaint even when a plaintiff fails to check the corresponding box. See, e.g., Rasheed v. D.C. Pub. Schs., Civ. A. No. 16-665 (CKK), 2019 WL 3598638, at *4–5 (D.D.C. Aug. 6, 2019). And cases dismissing claims as non-exhausted tend to emphasize both that the plaintiff did not

check the proper box <u>and</u> that he or she did not raise the claim in a narrative description.  <u>See, e.g.</u>, <u>McIver v. Mattis</u>, 318 F. Supp. 3d 245, 250 (D.D.C. 2018).

Here, Ravenell has at least gestured toward a potential retaliation claim in his narrative remedies request.  And there is a more fundamental problem with DHS's argument: DHS has provided the Court with only a three-page excerpt from Ravenell's ten-page EEOC complaint.  <u>See</u> EEOC Compl.  This excerpt suggests that Ravenell attached a narrative description of the challenged actions, <u>see id.</u> at *2 (Section 15 reference), but DHS has not provided the Court with this material.  DHS cannot be heard to argue for exhaustion based on a failure to raise claims in the EEOC complaint while omitting a portion of the complaint that appears to bear directly on this question.  <u>See Bain</u>, 648 F. Supp. 3d at 46 (noting that, because Title VII exhaustion is non-jurisdictional, "a defendant must raise exhaustion as an affirmative defense and bears the burden of proof").

DHS's third exhaustion argument, which also relates to Ravenell's retaliation claims, is more successful.  DHS maintains that Ravenell was required to file a new EEOC complaint to challenge any post-filing events that he now contends were retaliatory—specifically, his non-selection for the Section Chief position, the proposed suspension, and the letter of reprimand.  <u>See</u> Mot. at 10; Reply at 4; <u>see also</u> Compl. ¶ 100.  The success of this argument again turns on interpretation of the Supreme Court's decision in <u>Morgan</u>.  "<u>Morgan</u> dealt specifically with a factual scenario involving allegations of discrete discriminatory acts that had occurred <u>before</u> the plaintiff filed an administrative complaint, and the Supreme Court did not address exhaustion in the context of discriminatory or retaliatory incidents that occurred <u>after</u> an administrative complaint is filed."  <u>Mount v. Johnson</u>, 36 F. Supp. 3d 74, 84 (D.D.C. 2014).  Even so, most judges in this District—including this one—have concluded that <u>Morgan</u>'s logic also requires exhaustion

of claims based on discrete discriminatory or retaliatory acts that occurred after an initial EEOC complaint was filed.  See Rashad, 945 F. Supp. 2d at 166 (collecting cases); Keeley, 391 F. Supp. 2d at 40–41.  Again, Ravenell has given the Court no reason to reconsider its prior determination. Hence, the Court concludes that Ravenell has failed to exhaust his retaliation claims based on allegedly retaliatory events that occurred after he filed his first EEOC complaint.  However, recognizing that this exhaustion argument presents a closer question, the Court will also proceed to explain why Ravenell's retaliation claims fail on the merits.

In sum, the Court concludes that Ravenell has failed to exhaust any claims based on either (1) discrete discriminatory acts before May 17, 2019 or (2) allegedly retaliatory actions that occurred after he filed his EEOC complaint.  Out of an abundance of caution, the Court will also consider the merits of claims falling into the second category.  See infra Section I.D.

## B.  Race and Sex Discrimination Claims

Having addressed the parties' threshold exhaustion arguments, the Court will now consider the merits of each of Ravenell's remaining Title VII claims, beginning with his discrimination claims.  To make out a discrimination claim at the motion-to-dismiss stage, a plaintiff need only plausibly allege that he (1) "suffered an adverse employment action" (2) "because of" his race, sex, or other protected characteristic.  Garza v. Blinken, Civ. A. No. 21-2770 (APM), 2023 WL 2239352, at *4 (D.D.C. Feb. 27, 2023); see Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).[5]  Courts generally assess each discrete adverse employment action alleged in a

---

[5]  At summary judgment, courts evaluate most Title VII claims under the three-step burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  But this framework "is an evidentiary standard, not a pleading requirement."  Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510 (2002). Accordingly, a plaintiff need not "plead the elements of a prima facie case" (the first McDonnell Douglas step) in his complaint to survive a motion to dismiss.  Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (quoting Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008)).

complaint to determine on what bases, if any, a discrimination claim survives a motion to dismiss. See, e.g., Bain, 648 F. Supp. 3d at 35–37, 55–57.

Title VII defines the contours of an adverse employment action. Recall that Title VII's federal-sector provision provides that "[a]ll personnel actions affecting employees or applicants for employment . . . in [federal] agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a) (emphasis added). This provision is distinct from Title VII's private-sector antidiscrimination provision, which prohibits covered employers from "fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Id. § 2000e–2(a)(1) (emphasis added). But despite these differences in language, the D.C. Circuit has "long and repeatedly held that [Title VII's] federal-sector provisions are coterminous with their private-sector counterparts as far as the standard for an adverse action goes." Bain, 648 F. Supp. 3d at 53 (collecting cases).

Here, Ravenell's race and sex discrimination claims are both based on the same five alleged adverse employment actions: Harper's (1) alteration of his telework schedule, (2) "consistent[] interfere[nce] with his work by making unreasonable demands for performance," (3) "subject[ion of] him to criticism in front of other [ICE] staff," (4) "inappropriate and offensive comments to and about [him] in the workplace," and (5) "caus[ing] . . . Dougherty to involuntarily detail [him] to a new job position." Compl. ¶¶ 51, 71.[6] For the reasons discussed, Ravenell has failed to administratively exhaust his claims as to the alteration of his telework schedule and as to

_____

[6] Ravenell does not challenge his proposed suspension, letter of reprimand, or non-selection for the JFRMU Section Chief position (discussed further below) as adverse employment actions for purposes of his race or sex discrimination claims. See Compl. ¶¶ 51, 71; see also Mot. at 16.

unreasonable performance demands, criticism, and inappropriate comments that occurred before May 17, 2019.  The question, then, is whether he has plausibly alleged that he suffered an "adverse employment action" based on (1) any performance demand, critique, or inappropriate comment that occurred on or after May 17, 2019 or (2) the detail to ICE's Baltimore office.

Neither Ravenell's complaint nor his briefing is clear about which discrete performance demands, critiques, or unwelcome comments he believes constituted "adverse employment actions" on the basis of race or sex.  Construing the complaint charitably, the following incidents (on or after May 17, 2019) might fall into that category: Harper's statement to a coworker that "[Ravenell] and his girlfriend were not together when she became pregnant," her encouragement of Ravenell to apply to positions outside of JFRMU, her query as to whether Ravenell "had brands" and observation that "it has a slave connotation," her "What's wrong with him now?" query regarding Ravenell's sick leave to care for his son, and her demand that he complete a task by the Friday deadline.  Compl. ¶¶ 32–36.

DHS argues that none of these incidents (or the pre–May 17 incidents) constitutes an "adverse employment action" for two reasons.  First, DHS contends that these incidents are not "personnel actions" within the plain text of Title VII's federal-sector provision.  See Mot. at 13–16.  Alternatively, DHS maintains that these incidents are not cognizable even under the more expansive "terms, conditions, or privileges of employment" standard.  See id. at 16–18.  Ravenell does not respond to either argument.  See Opp'n at 14–17.  The Court need only reach the second one.[7]

---

[7] The Court notes, however, that DHS's argument for adopting a different understanding of Title VII's public-and private-sector provisions in this context has been rejected by "many" judges in this District in light of D.C. Circuit precedent.  Yuvienco v. Vilsack, Civ. A. No. 23-186 (RC), 2024 WL 727712, at *4 n.7 (D.D.C. Feb. 22, 2024) (collecting cases).

For much of the last twenty-five years, "plaintiffs in this circuit were required to allege that they had suffered 'objectively tangible harm' in order to plead an adverse action" for purposes of Title VII.  Bain, 648 F. Supp. 3d at 50; see also Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999).  This "judicial gloss on the statutory text" was intended to separate minor harms from "materially adverse consequences."  Bain, 648 F. Supp. 3d at 50 (quoting Brown, 199 F.3d at 457). But in 2022, the en banc D.C. Circuit dispensed with this "objectively tangible harm" requirement, holding that the statutory text requires only discrimination with respect to an employee's "terms, conditions, or privileges of employment."  Chambers v. District of Columbia, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc).

The D.C. Circuit provided limited guidance on the proper interpretation of the phrase "terms, conditions, or privileges of employment" going forward.  See id. 875, 877.  On the one hand, the Chambers court noted that this phrase "is capacious" and evinces a congressional "intent to strike at the entire spectrum of disparate treatment . . . in employment."  Id. at 874 (omission in original) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  On the other, the court recognized that the "phrase is not without limits—not everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment,'" id. at 874, and opined that a "reasonabl[e] constru[ction]" of the phrase would prevent it from "turn[ing] Title VII into a general civility code for the workplace," id. at 877 (internal quotation marks omitted).  The court also drew a distinction between hostile work environment claims, which proceed on the theory "that an abusive working environment amounts to a 'constructive alteration[] in the terms or conditions of employment' only if harassment is severe or pervasive," and claims "in which an employer discriminates against an employee with respect to the actual terms or conditions of employment—for example, by transferring [the] employee to a new position because of the

employee's race or sex."  Id. at 877–78 (alteration in original) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998)).

The state of the post-Chambers law is still unsettled.  See, e.g., Doe v. Austin, Civ. A. No. 22-3474 (RC), 2024 WL 864270, at *11 (D.D.C. Feb. 29, 2024) ("[T]he contours of the law remain unsettled."); Yazzie v. Nat'l Org. for Women, Civ. A. No. 19-3845 (RDM), 2024 WL 230244, at *11 (D.D.C. Jan. 22, 2024) (noting a dearth of "precedent to guide the Court").  The Supreme Court granted certiorari on the same question addressed in Chambers and heard argument last December, but has yet to rule.  See Muldrow v. City of St. Louis, 143 S. Ct. 2686 (2023).  Pending that decision, this Court remains bound by Chambers.

The Court is skeptical that any of Ravenell's allegations as to performance demands, critiques, or unwelcome comments go to the "terms, conditions, or privileges of employment" under Chambers.  The incidents Ravenell alleges are more like the types of harassment that can underpin a hostile work environment claim, such as "discriminatory intimidation, ridicule, and insult." Bain, 648 F. Supp. 3d at 59 (internal quotation marks omitted).  Because such harassment can amount to a constructive alteration to the "terms, conditions, or privileges of employment" only if it is "severe or pervasive" enough, it would be odd to conclude that a single incident of harassment amounts to an actual alteration to the same.  See Chambers, 35 F.4th at 877–78; see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (cleaned up)).

In any event, the Court need not squarely decide this question.  Ravenell has not identified which discrete allegations in his complaint he believes constitute adverse employment actions.  Nor has he developed any argument on this point or responded to DHS's arguments for dismissal.

Under these circumstances, and given the unsettled state of the case law, the Court declines to parse each of Ravenell's individual allegations or to formulate legal arguments on his behalf.  <u>See</u> <u>Wannall v. Honeywell, Inc.</u>, 775 F.3d 425, 428 (D.C. Cir. 2014); <u>Moore v. Castro</u>, 192 F. Supp. 3d 18, 40 (D.D.C. 2016), <u>aff'd sub nom. Moore v. Carson</u>, 775 F. App'x 2 (D.C. Cir. 2019).

That leaves only Ravenell's allegation that his detail to ICE's Baltimore office constituted an adverse employment action.  DHS concedes as much.  <u>See</u> Mot. at 16.  But, DHS argues, this detail cannot support a discrimination claim because Ravenell admitted that it was not undertaken "because of" his race or sex.  <u>Garza</u>, 2023 WL 2239352, at *4; <u>see</u> Mot. at 19.  DHS contends that Ravenell made this admission during a deposition in the EEOC administrative process.  <u>See</u> Mot. at 19.  This contention misconstrues the nature of Ravenell's allegations.  Ravenell's complaint alleges that Harper "<u>caused</u> . . . Dougherty to involuntarily detail [him] to a new job position" and that Harper did so based on his race and sex.  Compl. ¶¶ 51, 71 (emphasis added).  Ravenell's statements during his deposition—assuming the Court were even to consider them at this stage— are not inconsistent with this allegation.  Ravenell stated that he was not "saying [Dougherty] made [the detail decision] based on race and sex."  Ex. B to Mot. [ECF 6-3] at *5.  Ravenell now argues persuasively that "his responses were specific to Ms. Dougherty's personal motivations in approving the detail."  Opp'n at 23.  His theory—wholly consistent with the language of his complaint—is that "he has pleaded that Ms. Harper's actions were based upon his race and sex, and Ms. Dougherty approved the detail because of Ms. Harper's communications to her."  <u>Id.</u>

Ravenell's allegations make out a quintessential "cat's paw" theory of discrimination:

> [T]he law is settled that an employer's liability for the discriminatory acts of its agents goes beyond the final decisionmaker—the person actually making the [employment] decision.  The actions of a discriminatory supervisor that feed into and causally influence the decisionmaker's ultimate determination may also be the proximate cause of an adverse employment action.

Steele v. Mattis, 899 F.3d 943, 950 (D.C. Cir. 2018); see Walker v. Johnson, 798 F.3d 1085, 1095 (D.C. Cir. 2015). DHS tacitly concedes as much in its reply brief. See Reply at 7. Instead, DHS pivots to arguing that Ravenell has not plausibly alleged that Harper's communications to Dougherty were "due to his race or sex." Id. DHS maintains that "[Ravenell's] own pleadings make implausible any inference that Harper acted with discriminatory motive," apparently on the theory that Ravenell's own description of the altercation shows that he acted improperly and supports an inference that Harper's communications were not motivated by his race or sex. Id. This argument is unsuccessful. The gravamen of Ravenell's entire complaint is that Harper was prejudiced against him on account of his race and sex and that this discriminatory animus infected her actions toward him—including the way that she described the June 2019 altercation to Dougherty, which appears to have been a proximate cause of the detail.[8]

Hence, the Court concludes that Ravenell has plausibly alleged claims of race and sex discrimination based on Harper's communications to Dougherty in the lead-up to the detail, but that Ravenell's race and sex discrimination claims must be dismissed to the extent that they rely on other predicate adverse employment actions. Ravenell may of course still rely on these other incidents as "background evidence" in support of his claims based on the detail. Morgan, 536 U.S. at 113.

### C.  Hostile Work Environment Claim

Ravenell also brings a hostile work environment claim. As noted, such a claim proceeds on the theory that discriminatory harassment in an abusive working environment may amount to a constructive alteration of the "terms, conditions, or privileges of employment" under Title VII.

---

[8] DHS also argues that it had a legitimate, nondiscriminatory reason for the detail—Harper's concern for her safety after the altercation—and that Ravenell will not be able to show that this proffered explanation is pretextual. See Mot. at 20; Reply at 7–8. Whatever the merits of that view, Ravenell is entitled to discovery before the Court rules on it.

See <u>Chambers</u>, 35 F.4th at 877–78.  "A plaintiff pleading a hostile work environment claim must show that he was exposed to 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Durant v. D.C. Gov't</u>, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21 (1993)).  In assessing a hostile work environment claim, courts consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Id.</u> (quoting <u>Harris</u>, 510 U.S. at 23).

Here, Ravenell asserts a hostile work environment claim based on "unlawful and inappropriate verbal conduct" by Harper.  Compl. ¶ 90.  The Court will assume that this claim encompasses all of the allegations in his complaint, not just allegations based directly on Harper's statements.  These allegations generally involve racially charged comments, unreasonable performance demands and critiques of Ravenell's work, the alteration of his telework privileges, and the eventual June 2019 altercation.  <u>See</u> <u>id.</u> ¶¶ 22–44.

While the question is close, the Court concludes that these allegations are sufficient to plausibly state a hostile work environment claim at this early stage of the case.  For one thing, various of Harper's alleged derogatory comments "expressly" involved Ravenell's race and racial stereotypes.  <u>Baloch</u>, 550 F.3d at 1201.  For another, the alleged incidents occurred over a 19-month period, with many of them further concentrated between December 2018 and June 2019. The frequency of these incidents within a relatively short time span lends support to a showing of pervasiveness.  <u>See</u> <u>Crews v. Carson</u>, Civ. A. No. 19-3538 (CRC), 2020 WL 12948520, at *6 (D.D.C. Oct. 16, 2020).  That is not to say that Ravenell will ultimately prevail on this claim.  But,

"[w]hile the parties' evidence may reveal that the alleged misconduct does not rise to the level of severity or pervasiveness called for by the law or was not discriminatory, the conduct as stated is sufficiently offensive and frequent to survive a motion to dismiss." Moore, 192 F. Supp. 3d at 47.

### D.  Retaliation Claims

Finally, Ravenell asserts two Title VII retaliation claims.  Title VII's private-sector provisions prohibit retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The D.C. Circuit construes Title VII's federal-sector provision, which does not explicitly speak to retaliation, as incorporating this same prohibition. See id. § 2000e-16; Grosdidier v. Broad. Bd. of Governors, Chairman, 709 F.3d 19, 23 (D.C. Cir. 2013).  To make out a retaliation claim, a plaintiff must plausibly allege "that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim" or engaged in other statutorily protected action.  Bain, 648 F. Supp. 3d at 55 (quoting Baloch, 550 F.3d at 1198); see Belov v. World Wildlife Fund, Inc., Civ. A. No. 21-1529 (JEB), 2021 WL 4773236, at *5 (D.D.C. Oct. 13, 2021).[9]

Here, Ravenell alleges that he was retaliated against (1) for his EEOC complaint, when he was not selected for the JFRMU Section Chief position that was filled in October 2019, and (2) for his "complaints" to Dougherty about Harper's conduct, when he was "subjected to [the] internal investigation" that resulted in a proposed suspension and a letter of reprimand.  Compl. ¶ 100.  DHS persuasively argues that Ravenell never applied for the Section Chief position and

---

[9] The adverse action standard is different for retaliation claims than for discrimination claims, and was not altered by the D.C. Circuit's decision in Chambers.  See Chambers, 35 F.4th at 876.

that he has not plausibly alleged that his complaints to Dougherty constituted protected activity. See Mot. at 23–27.

As to the non-selection claim, Ravenell concedes in his briefing that he chose not to apply for the JFRMU Section Chief position because he did not want to return to JFRMU while Harper was there:

> [Ravenell] is not claiming that he was not selected as Section Chief in an act of discrimination, but that [he] did not apply for the position because of the discriminatory treatment he was subjected to.  The act of selecting another candidate for the position of [S]ection [C]hief is not [Ravenell's] issue; his claim lies in the fact that his decision to not apply to the position was due to the intense mental and emotional toll that Ms. Harper's actions had taken on [him] as a result of the hostile and racially offensive work environment she created. . . .  [Ravenell] chose not to apply for a position that would require him to be in the same hostile work environment that he was trying to alleviate . . . .

Opp'n at 25–26.  While Ravenell's choice not to reenter a work environment he viewed as toxic is understandable, it does not a retaliation claim make.  Non-selection claims such as these are fundamentally undermined by a "failure to apply" to the position at issue, Lathram v. Snow, 336 F.3d 1085, 1089 (D.C. Cir. 2003); see also McCallum v. Mayorkas, Civ. A. No. 21-1911 (ABJ), 2023 WL 3203011, at *11 (D.D.C. May 2, 2023), and Ravenell offers no legal support for his argument to the contrary.  DHS did not retaliate against Ravenell by not affirmatively selecting him for a position for which he never applied.[10]

Nor does Ravenell plausibly allege that his "complaints" to Dougherty constituted statutorily protected activity.  The D.C. Circuit has made clear that "not every [workplace] complaint garners its author protection under Title VII" for purposes of a retaliation claim.

---

[10] In the discrimination context, there is an exception "when such an application would have been futile"— i.e., when an employer's "policy of gross and pervasive discrimination communicated to a protected class the futility of applying" for a position.  McCallum, 2023 WL 3203011, at *11 (internal quotation marks omitted).  Even assuming that the logic of this futility exception extends to the retaliation context, Ravenell has not developed any futility argument here.  He argues that he chose not to apply because he did not want to be around Harper, not because he had no chance of being selected.  See Opp'n at 25–26.

Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  "While no 'magic words' are required, the [workplace] complaint must in some way allege unlawful discrimination . . . ."  Id.  Judge Boasberg's opinion in Belov is instructive on this point.  There, the plaintiff alleged that her former supervisor harbored a discriminatory attitude toward pregnant and nursing women.  See Belov, 2021 WL 4773236, at *1.  She asserted, inter alia, a retaliation claim premised on a workplace complaint she lodged with Human Resources regarding a dispute with this supervisor about attendance at an out-of-state meeting.  Id. at *6.  But she did not "allege[] that she reported sex discrimination to Human Resources," nor did her allegations otherwise suggest "that . . . going to Human Resources about a travel dispute qualifie[d] as protected activity under Title VII."  Id.  The Belov court thus concluded that she had failed to plausibly allege retaliation under Title VII.  Id. (collecting cases).

So too here.  Ravenell's workplace "complaints"—as clear from the context of his complaint and as confirmed in his briefing—are his communications to Dougherty immediately following his June 2019 altercation with Harper.  See Compl. ¶ 41, 100; Opp'n at 26.  There is no indication that these complaints involved any claims of unlawful discrimination under Title VII as opposed to simply frustration about a workplace argument.  See Compl. ¶ 41.  Hence, Ravenell has failed to plausibly allege that the internal investigation was retaliation for his engagement in a protected activity.[11]

---

[11] DHS's other arguments on this point are less persuasive.  DHS contends that Ravenell fails to plausibly allege that the letter of reprimand—the ultimate outcome of the internal investigation—contained sufficiently "abusive language" to constitute a materially adverse employment action.  Mot. at 25–26.  But given the nuances in this determination, "many courts" defer consideration of letters of reprimand until summary judgment.  Bell v. Fudge, Civ. A. No. 20-2209 (CRC), 2022 WL 4534603, at *6 (D.D.C. Sept. 28, 2022).

DHS also maintains that Ravenell's complaints to Dougherty cannot have caused the proposed suspension or letter of reprimand (which he received many months later), because "[m]ere temporal proximity [can] support an inference of causation only where the two events are very close in time."  Mot. at 26 (second alteration in original) (quoting Pueschel v. Chao, 955 F.3d 163, 167 (D.C. Cir. 2020)).  But this is not an instance of seemingly unrelated incidents connected only by "mere temporal proximity."  Ravenell alleges that he complained to Dougherty about

## II.     Rehabilitation Act Claims

In addition to his Title VII claims, Ravenell brings claims under the Rehabilitation Act, which "governs employee claims of [disability] discrimination against the Federal Government." Ward v. McDonald, 762 F.3d 24, 28 (D.C. Cir. 2014) (internal quotation marks omitted).   It provides that "[n]o otherwise qualified individual with a disability" shall be discriminated against by a federal agency "solely by reason of her or his disability."   29 U.S.C. § 794(a).   Potential violations of this nondiscrimination provision are judged using "the standards applied under" the Americans with Disabilities Act of 1990 ("ADA").   Id. § 794(d).   The ADA, in turn, prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).

Ravenell advances two Rehabilitation Act claims: (1) that DHS failed to provide him with reasonable accommodations to care for his son, who has Type 1 diabetes, and (2) that DHS (presumably through Harper) "used [Ravenell's] status as the father of a disabled child to harass, demean, degrade, and humiliate [him]."   Compl. ¶¶ 118–19.   As to the first claim, DHS argues that Ravenell fails to allege that he (rather than his son) has a disability and that he never requested reasonable accommodations.   See Mot. at 27–28.   As to the second, DHS reiterates its argument that Ravenell is not personally disabled and further contends that this claim fails for the same

---

Harper and that DHS retaliated by launching an investigation against him.   See Compl. ¶ 100.   That the result of that investigation was not handed down for many months does not somehow causally sever it from the thing that allegedly prompted the investigation in the first place.

reasons Ravenell's Title VII claims based on similar comments fail.  See id. at 28–29.  The Court

concurs on both counts.[12]

"To state a claim for a violation of the Rehabilitation Act's reasonable accommodation

requirements, a plaintiff must allege that '(i) she was disabled within the meaning of the

Rehabilitation Act; (ii) her employer had notice of her disability; (iii) she was able to perform the

essential functions of her job with or without reasonable accommodation; and (iv) her employer

denied her request for a reasonable accommodation of that disability.'"  Menoken v. Dhillon, 975

F.3d 1, 7 (D.C. Cir. 2020) (quoting Solomon v. Vilsack, 763 F.3d 1, 9 (D.C. Cir. 2014)).  The

statute defines "discriminat[ion] against a qualified individual on the basis of disability" for

purposes of a reasonable accommodations claim as:

> not making reasonable accommodations to the known physical or mental
> limitations of an otherwise qualified individual with a disability who is an applicant
> or employee, unless such covered entity can demonstrate that the accommodation
> would impose an undue hardship on the operation of the business of such covered
> entity; or
>
> denying employment opportunities to a job applicant or employee who is an
> otherwise qualified individual with a disability, if such denial is based on the need
> of such covered entity to make reasonable accommodation to the physical or mental
> impairments of the employee or applicant . . . .

42 U.S.C. § 12112(b)(5)(A)–(B) (emphasis added).  The plain text of this provision refers to

reasonable accommodations based on the disability of the employee, not that of a family member

or associate.  Case law describing this provision is in accord with this understanding.  See, e.g.,

Hill v. Assocs. for Renewal in Educ., Inc., 897 F.3d 232, 237 (D.C. Cir. 2018) ("To prevail on a

---

[12] DHS argues in passing that Ravenell has failed to exhaust his failure-to-accommodate claim because he did not raise it in his EEOC complaint.  See Mot. at 9–10.  The Court rejects the argument.  In his administrative complaint, Ravenell checked the box for "physical or mental disability" and noted that this was due to "association w/my minor child who has T1D."  EEOC Compl. at *2.  And, as discussed above, DHS has not provided a portion of the complaint that would potentially elaborate on the nature of Ravenell's disability claims.

failure-to-accommodate claim, a plaintiff must show . . . that <u>he or she has a disability</u> under the ADA . . . ." (emphasis added)).

Ravenell concedes that he does not have a disability.  <u>See</u> Opp'n at 19.  But he maintains that the ADA also prohibits discrimination against "those associated with disabled individuals." <u>Id.</u>  He points to a different provision in the statute that prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).  However, Ravenell's complaint asserts a failure-to-accommodate claim, not a claim based on the alleged denial of "equal jobs or benefits" based on his son's disability.  <u>See</u> Compl. ¶¶ 35, 39, 118.[13]  If anything, the fact that this separate provision explicitly provides for liability based on the disability of associated persons strengthens the conclusion that the reasonable accommodations provision refers only to the disability of the employee.  <u>See</u> <u>Salinas v. U.S. R.R.</u> <u>Ret. Bd.</u>, 141 S. Ct. 691, 698 (2021) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting <u>Russello v.</u> <u>United States</u>, 464 U.S. 16, 23 (1983))).

Ravenell's reasonable accommodations claim also fails for the independent reason that he never actually requested an accommodation.  "[A]n underlying assumption of any reasonable

---

[13] In his brief, Ravenell suggests that Harper denied his telework schedule on account of his son's disability. <u>See</u> Opp'n at 19.  But his complaint contains no such allegations (instead alleging race and sex discrimination under Title VII), <u>see</u> Compl. ¶¶ 22, 51, 71, and it is well-established that a plaintiff "may not amend [his] complaint through an opposition brief," <u>Doe #1 v. Am. Fed'n of Gov't Emps.</u>, 554 F. Supp. 3d 75, 101 n.13 (D.D.C. 2021) (internal quotation marks omitted).  In any event, Ravenell failed to exhaust his administrative remedies as to the alteration of his telework schedule by failing to timely contact an EEO counselor.  <u>See</u> <u>Bain</u>, 648 F. Supp. 3d at 45–46 (noting that administrative exhaustion under the Rehabilitation Act follows the same Title VII process discussed above).

It also bears noting that Ravenell has not asserted any claim under the Family and Medical Leave Act, 29 U.S.C. § 2601 <u>et seq.</u>

accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied." Waggel v. George Washington Univ., 957 F.3d 1364, 1372 (D.C. Cir. 2020) (internal quotation marks omitted). Mere "[n]otice of a disability does not ordinarily satisfy [this] requirement, which performs the independent function of informing an employer of the limitations imposed by a disability and the nature of the accommodation needed to remedy those limitations." Id. Here, Ravenell concedes that he "did not make specific requests for accommodations beyond his requests for leave and a telework schedule," but argues that "those requests were based on his need to care for his disabled son." Opp'n at 19–20. That is insufficient. See Waggel, 957 F.3d at 1372.

Ravenell's claim of disability discrimination based on alleged harassment "as the father of a disabled child" is also unavailing. Compl. ¶ 119. For one thing, it is not clear that such a status can support a discrimination claim under the Rehabilitation Act. See 29 U.S.C. § 794(a) (prohibiting discrimination against qualified individuals "solely by reason of her or his disability" (emphasis added)); see also Alexander v. Washington Metro. Area Transit Auth., 826 F.3d 544, 546 (D.C. Cir. 2016) ("[T]o prevail on a claim of discrimination under the Rehabilitation Act, a plaintiff must first establish that he has a 'disability' . . . ."). But even assuming it could, this claim founders on the same shoals as Ravenell's Title VII discrimination claims based on performance demands, critiques, and unwelcome comments: the Court is skeptical that the discrete alleged comments that relate to Ravenell's son's disability go to the "terms, conditions, and privileges of [Ravenell's] employment," 42 U.S.C. § 12112(a); see Compl. ¶¶ 30, 35, 38–39, and Ravenell has entirely failed to respond to DHS's arguments on this point, see Wannall, 775 F.3d at 428.[14]

---

[14] The D.C. Circuit has long interpreted the relevant provisions of Title VII and the Rehabilitation Act in tandem. See Bain, 648 F. Supp. at 51. There is some question whether Chambers, which removed the objectively tangible harm requirement in the Title VII context, should be read to do the same in the Rehabilitation Act context.

**Conclusion**

For the foregoing reasons, the Court will deny DHS's motion as to Ravenell's claims of race and sex discrimination based on the detail and as to his hostile work environment claim, but will grant it as to all his remaining claims.  An accompanying Order will issue on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>March 29, 2024</u>

---

See <u>id.</u> at 51–52.  The Court need not resolve that issue here, because Ravenell's disability discrimination claim fails even under the more forgiving standard set forth in <u>Chambers</u>.