**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ERIC RAVENELL,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MARKWAYNE MULLIN,[1]**<br>***Secretary of Homeland Security*,**<br><br>**Defendant.** | **Case No. 22-cv-3548 (GMH)** |

## MEMORANDUM OPINION

Following his involuntary detail to a different office in the wake of a heated confrontation with his supervisor, Immigration and Customs Enforcement ("ICE") employee Eric Ravenell sued the Secretary of Homeland Security under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973. His claims arising from other incidents of alleged discrimination, his retaliation claims, and his Rehabilitation Act claims were previously dismissed. His remaining discrimination claim alleges that his supervisor exaggerated her description of the confrontation based on race- and sex-based animus when reporting it to her superior, who made the ultimate decision to detail Ravenell. And his remaining hostile work environment claim alleges a broader pattern of race- and sex-based harassment by his supervisor. The Secretary now moves for summary judgment on those claims. Because the Court concludes that no reasonable factfinder could find for Ravenell on either claim, the Court will grant the motion.[2]

[1] The current Secretary of Homeland Security Markwayne Mullin is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The docket entries relevant to this Memorandum Opinion are (1) the Secretary's motion for summary judgment and attached exhibits, ECF No. 28; (2) Ravenell's opposition to the Secretary's motion and attached exhibits, ECF No. 32; and (3) the Secretary's reply in support of his motion for summary judgment, ECF No. 35. Page number references herein to documents in the record are made to the page numbers assigned by CM/ECF.

# I. BACKGROUND

## A. Factual Background[3]

Ravenell's claims arise from a series of negative interactions with Mellissa Harper, his immediate supervisor, ultimately culminating in a heated argument and his involuntary detail to the ICE field office in Baltimore. Ravenell, a Black man, has been employed by ICE since 2004.[4] ECF No. 28-1, ¶¶ 1, 3. From November 2014 to October 2019, Ravenell was a Detention and Deportation Officer in the Juvenile and Family Residential Management Unit. *Id.*, ¶¶ 4–5. Ravenell worked in an ICE field office in Washington, D.C., until his transfer to the Baltimore field office. *See* ECF No. 32-5 at 5; *Ravenell v. Mayorkas*, No. 22-cv-3548, 2024 WL 1344460, at *1 (D.D.C. Mar. 29, 2024). In the Washington D.C. office, Ravenell reported to Harper, and Harper

[3] The Court's Scheduling and Procedures Order cautions that this Court "strictly adheres to the dictates of Local Civil Rule 7(h)" and requires the party opposing summary judgment to "file a separate document" responding to each paragraph of the movant's statement of undisputed material facts "with a correspondingly-numbered paragraph indicating whether that paragraph is admitted or denied." ECF No. 21 at 3. If the nonmovant's statement includes additional facts, the movant may respond with a counterstatement identifying which of those facts are disputed. Under Federal Rule of Civil Procedure 56(e) and Local Civil Rule 7(h), if a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court may "consider the fact undisputed for the purposes of the motion" and "grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e); *see* LCvR 7(h).

Here, both parties filed statements of material facts that recount their versions of events rather than identify the facts they dispute. The Secretary filed a Statement of Undisputed Material Facts with his motion for summary judgment. *See* ECF No. 28-1. Ravenell responded with a "Statement of Genuine Issues of Material Facts in Dispute" that fails to identify the facts that he disputes or even to respond at all to many of the facts asserted to be undisputed by the Secretary. *See* ECF No. 32-2. Instead, Ravenell's statement of material facts repeats the factual allegations, almost word for word, from his complaint, including facts in addition to those asserted by the Secretary. *Compare id. with* ECF No. 1 at 5–12. The Secretary, for his part, did not respond with a counterstatement disputing the additional factual assertions in Ravenell's statement. In sum, the parties submitted dueling statements of material facts that, though they recount many of the same events, each assert additional facts unaddressed in the other statement.

Accordingly, the Court treats the parties' statements of material facts as undisputed to the extent that they are supported by the record and do not contradict one another. *See, e.g.*, *Booker v. D.C. Gov't*, No. 19-cv-2639, 2023 WL 4156684, at *1 n.3 (D.D.C. June 23, 2023); *Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (noting that where a party does not properly controvert a factual assertion, the Court should treat the movant's "factual assertions [that] are properly supported by the record . . . as admitted"). And the Court notes the few instances where the party's factual assertions do contradict each other. Ultimately, as will be seen, to the extent there are any factual disputes, they are not material to the Court's analysis.

[4] To the extent this opinion includes individuals' race and/or sex, it is because such traits are relevant to Ravenell's claims.

reported to Deane Dougherty, both of whom are white women. ECF No. 28-1, ¶¶ 6–7. Dougherty's supervisor was the acting director of ICE, a Black man. *Id.*, ¶ 8; ECF No. 32-5 at 38.

Ravenell's working relationship with Harper began to sour "[i]n or around November or December of 2017" when, in Ravenell's view, Harper began interfering with his telework schedule. ECF No. 32-2, ¶ 1. Ravenell's telework agreement allowed him to work remotely on Fridays. *See id.* Ravenell testified in his deposition that while Harper "didn't cancel [his] telework agreement," "she would ask [him] to come in on [his] day off." ECF No. 32-5 at 16–17. This occurred despite Harper being "advised . . . not to make any changes to the telework schedule." ECF No. 32-2, ¶ 1. He testified in his deposition that his telework was "reinstated in June or July of 2018." ECF No. 32-5 at 20.

Two more incidents occurred about six months later in January 2018. ECF No. 28-1, ¶ 9; ECF No. 32-2, ¶ 2. During a conversation regarding another ICE employee who is a Black man, Harper referred to the fact that this employee had been involved in a fatal car accident in his government vehicle. ECF No. 28-1, ¶ 10. According to Ravenell, Harper "said you know he killed someone in a government vehicle." ECF No. 32-2, ¶ 3. Ravenell acknowledges that this employee "was involved in a car accident" and the "person in the other vehicle did die" but maintains that the accident "was not [the ICE employee's] fault." *Id.*, ¶ 3. Also in January 2018, Ravenell claims that Harper "referred to [a different male ICE employee and former member of Harper and Ravenell's unit] as Kim Jong-un in a meeting with" Ravenell. *Id.*, ¶ 2. Ravenell's deposition testimony clarifies that he did not view this comment as *racially* motivated because this employee is "not of Asian descent." ECF No. 32-5 at 22. But he views this as evidence of Harper's sex-based animus. *See* ECF No. 32-1 at 21.

Nearly a year later, in November 2018, while Harper was in Texas for a work event, Ravenell missed a call from her at around 10:30 AM. ECF No. 32-2, ¶ 4. Ravenell texted Harper inquiring whether she intended to call him. *Id.* Harper responded via text: "the fucking address on the fact sheet is wrong," apparently referring to the address of the event in Texas. ECF No. 28-1, ¶ 11; *see also* ECF No. 32-2, ¶ 4; ECF No. 32-10 at 33. Ravenell explained that "the only address they had was the one on the fact sheet," to which Harper responded, "we'll [sic] google it." ECF No. 32-2, ¶ 4; *see also* ECF No. 32-10 at 33.

The next incident occurred on December 6, 2018. ECF No. 32-2, ¶ 5. Harper initiated a meeting with ICE employees from other units to discuss the plan (apparently developed by Ravenell and his unit) for an upcoming training program. *Id.* Ravenell joined the meeting virtually because he was traveling at the time. *Id.* When the other ICE employees "negatively criticized" the plan, Ravenell "advised [Harper] several times on the call that [his team] had made significant changes" to the plan and suggested meeting with Harper to review the changes before sharing the plan outside of their unit. *Id.* At some point during this call, "Harper 'ordered Ravenell to hang up the phone," ECF No. 28-1, ¶ 12, or "get off her call," ECF No. 32-2, ¶ 5. Once the meeting concluded, Ravenell claims that Harper "asked [Ravenell] what his problem was" in a follow-up call between the two of them. ECF No. 32-2, ¶ 5.

Three months later, on March 8, 2019, Ravenell alleges that "Harper called [Ravenell] . . . and asked him about his leave and whether his attendance was going to become an issue." *Id.*, ¶ 6. This was in response, Ravenell believes, to him scheduling "leave for about a week because his significant other was out of town and he needed to be home for before care and aftercare of the children." *Id.*

About a week later, on March 27, 2019, Harper mentioned to Ravenell, himself a graduate of a Historically Black College or University ("HBCU"), that Harper's son—whom, according to Ravenell, she adopted and is Black—wanted to attend an HBCU. *Id.*, ¶ 7; *see also* ECF No. 32-5 at 40; *see also* ECF No. 32-1 at 8. Ravenell states that Harper added that "she didn't think it was a good idea because it was not real life and either referred to the school as ghetto or the area in which it was located as ghetto." ECF No. 32-2, ¶ 7. According to the Secretary, Harper "said certain historically black colleges and universities ('HBCUs') such as Spellman and Moorhouse were located in 'the ghetto.'" ECF No. 28-1, ¶ 13.

The next incident occurred sometime in May 2019, though the details are foggy. ECF No. 32-2, ¶ 8. Ravenell's statement of disputed material facts asserts: "In May 2019 it was suggested to [Ravenell] from [a coworker] that Ms. Harper told [a different coworker] that [Ravenell's] girlfriend and him were not together when she became pregnant." *Id.* This led Ravenell to question "what [Harper] thought of men particularly that of African American men." *Id.*

Then, on May 17, 2019, Harper suggested that Ravenell apply for a Senior Detention and Deportation Office position in Baltimore. *Id.*, ¶ 9. She also inquired about whether he would be interested in a position in the field and offered to "reach out to the Field Office Director on his behalf." *Id.* According to Ravenell, these offers made him "question his position . . . and [his] worth to [the unit]." *Id.*

Next, on June 14, 2019, during a conversation in Harper's office about her son's college plans, Harper asked Ravenell "if he was in a fraternity and if he had brands." ECF No. 32-2, ¶ 10; *see also* ECF No. 28-1, ¶ 15. Ravenell responded that "he had several." ECF No. 32-2, ¶ 10. Harper "asked if he was concerned about what people thought" and added that she did not want to

her son to receive fraternity brands because "it has a slave connotation." *Id.*; *see also* ECF No. 28-1, ¶¶ 16–17.

Later that same day, Ravenell submitted a request to use sick leave on the following Tuesday. ECF No. 32-2, ¶ 10. Harper called Ravenell to inquire why he was taking leave. *Id.* When Ravenell informed Harper that it was to care for his son, who suffers from Type 1 diabetes, Harper responded "What's wrong with him now?" *Id.*; *see also* ECF No. 28-1, ¶ 2.

The tension between Ravenell and Harper reached its crescendo about a week later, on June 20, 2019. A few days earlier, Harper had given Ravenell and other members of the unit a large assignment with a deadline of June 21, 2019. ECF No. 28-1, ¶¶ 18–19. On June 20, Ravenell informed Harper that technical issues prevented him from making progress on the assignment. ECF No. 28-1, ¶ 20; ECF No. 32-2, ¶ 11. Harper responded that the assignment needed to be completed by close of business the following day because it was "needed for a federal court order." ECF No. 28-1, ¶ 21–22; ECF No. 32-2, ¶ 11. "You can't get blood from a turnip," Ravenell replied. ECF No. 28-1, ¶ 23; ECF No. 32-2, ¶ 11. As Harper began to walk away, she said "That's not my problem, why did you just get [the assignment] yesterday," which Ravenell perceived to refer to his use of sick leave to take his son to the doctor earlier that week. ECF No. 32-2, ¶ 11.

Following Harper into her office, Ravenell said "You're not going to do that, lets finish this in your office." *Id.*; *see also* ECF No. 28-1, ¶ 24. Ravenell continued, "[Y]ou will not make me feel guilty for taking my son to the doctor." ECF No. 32-2, ¶ 11; *see also* ECF No. 28-1, ¶ 26. Ravenell then recalled and confronted Harper with her previous "What's wrong with him now?" comment. ECF No. 32-2, ¶ 11. Harper responded, "I did not say that. If I did, I was wrong." *Id.* The Secretary notes that employees standing outside the office "observed that Ravenell 'went crazy and got really loud.'" ECF No. 28-1, ¶ 29. At some point during the argument, another

employee entered Harper's office and "tried to encourage Ravenell to exit her office." *Id.*, ¶ 31. As Ravenell began to leave, Harper exclaimed that "he was being juvenile." ECF No. 32-2, ¶ 11; *see also* ECF No. 28-1, ¶ 33.

Ravenell then returned to Harper's office. ECF No. 32-2, ¶ 11. The parties dispute whether Ravenell "closed," *id.*—Ravenell's word—or "slammed the door behind him"—the Secretary's description. ECF No. 28-1, ¶ 34. In Harper's office, Ravenell continued to object to Harper's perceived criticism of his use of sick leave. ECF No. 32-2, ¶ 11. Ravenell describes his tone of voice as "adamant," *id.*, while the Secretary notes that other employees reported that it was loud enough that it could be heard through the closed door. ECF No. 28-1, ¶ 30. At some point during the confrontation, Ravenell "gestured toward Harper and waved his finger." ECF No. 28-1, ¶ 35; *see also* ECF No. 32-2, ¶ 11. Harper "told Ravenell to take his finger out of her face." ECF No. 28-1, ¶ 36; *see also* ECF No. 32-2, ¶ 11. According to Ravenell, while "he was more than an arms-length away," Harper "reached over and grabbed his finger." ECF No. 32-2, ¶ 11.

Employees monitoring the incident from outside Harper's office then told Ravenell to "open the door" because they were concerned that the argument "was going to escalate." ECF No. 28-1, ¶ 37. At that point, Ravenell said to Harper, "You are so lucky." *Id.*, ¶ 38; *see also* ECF No. 32-1 at 17–18. The parties dispute the meaning of this statement. Harper took this statement to mean that "she was lucky Ravenell did not strike her." ECF No. 28-1, ¶ 39. Ravenell's opposition to the motion for summary judgment avers that "to the extent that he said 'you are so lucky,'" he meant that "she was lucky that he had not filed an EEO complaint or reported her to OPR over the previous sixteen (16) months." ECF No. 32-1 at 17–18. Two ICE employees then entered Harper's office "to separate and [defuse] the situation." ECF No. 28-1, ¶¶ 40–41.

According to Ravenell, he then "walked down the hall and called" Harper's supervisor Dougherty. ECF No. 32-2, ¶ 11. When Dougherty did not answer, he asked her assistant to have her "call him immediately." *Id.* Before Ravenell could speak with Dougherty, Harper called Dougherty and "relayed . . . the incident" to her. ECF No. 28-4 at 35–36, ¶ 20; *see also* ECF No. 28-1, ¶ 48; ECF No. 32-2, ¶ 11. Once Dougherty learned that Ravenell was trying to contact her, she "ended the call with Ms. Harper and phoned Mr. Ravenell." ECF No. 28-4 at 35–36, ¶ 20. Ravenell explained what had happened "to the best of his abilities as he was emotionally overwrought." ECF No. 32-2, ¶ 11. Ravenell then finished his workday. *Id.*

After hearing from both Ravenell and Harper, "Dougherty sent an email to her supervisor, [the acting director], relaying the events of that day as they were portrayed to Dougherty." ECF No. 28-1, ¶ 50; *see also* ECF No. 28-4 at 36, ¶ 22. Later in the evening, Harper again contacted Dougherty and stated that she "'believed she was subject to a hostile work environment during the altercation with [Ravenell],' that she 'feared for her safety,' and that Ravenell 'had been physically intimidating during their verbal altercation though no physical contact had occurred.'" ECF No. 28-1, ¶ 52 (alteration in original); *see also* ECF No. 32-2, ¶ 11; ECF No. 28-4 at 36–37, ¶ 23. The following day, June 21, Dougherty detailed Ravenell to the Baltimore field office "to allow the atmosphere to settle." ECF No. 28-1, ¶ 58; ECF No. 32-2, ¶ 11.

On July 1, 2019, Ravenell initiated Equal Employment Opportunity ("EEO") counseling. ECF No. 32-10 at 10–13. A few weeks later, in July, at his own request, Ravenell transferred to another unit within ICE. ECF No. 28-1, ¶ 62. Following ICE's internal investigation into the incident, ICE issued Ravenell a "proposed notice" of a five-day suspension on August 13. ECF No. 32-2, ¶ 13; *see also* ECF No. 28-1, ¶ 65. Following consideration of Ravenell's response to

the proposed notice, ICE ultimately issued Ravenell a formal reprimand but not a suspension. ECF No. 32-2, ¶ 13; *see also* ECF No. 28-1, ¶ 67.

Three months later, in October 14 2019, Ravenell asserts that, after lodging "complaints about the treatment he was receiving"—apparently referring to his contact with an EEO counselor in July and not his formal EEOC complaint filed eight days later on October 22, 2019, *see* ECF No. 32-10 at 2, 13—he "was not selected for the Section Chief position" in Harper's unit. ECF No. 32-2, ¶ 12; *see also* ECF No. 32-10 at 10–13. The Secretary's statement of material facts asserts, and Ravenell does not dispute, that Ravenell "did not apply" for this position. ECF No. 28-1, ¶ 61.

### B. Procedural History

Ravenell initiated EEO counseling on July 1, 2019, and filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on October 22, 2019. ECF No. 32-10 at 2, 13. Following the denial of his EEOC complaint, Ravenell filed his federal complaint against the Secretary of Homeland Security on November 21, 2022. ECF No. 1. The complaint asserts claims for race and sex discrimination, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964. *Id.*, ¶¶ 49–115. And it asserts a claim under the Rehabilitation Act of 1973. *Id.*, ¶¶ 116–122. It seeks declaratory and injunctive relief and $500,000 in damages. *Id.* at 24.

On April 20, 2023, the Secretary moved to dismiss and for partial summary judgment. ECF No. 6. Judge Bates, to whom this case was previously assigned, granted that motion in part and denied it in part. *Ravenell*, 2024 WL 1344460, *16. Judge Bates concluded that Ravenell "failed to exhaust any claims based on either (1) discrete discriminatory acts before May 17, 2019 or (2) allegedly retaliatory actions that occurred after he filed his EEOC complaint." *Id.* at *7. And he

found that Ravenell failed to state a claim under the Rehabilitation Act of 1973. *Id.* at *15. He thus dismissed those claims. *Id.* at *16.

Judge Bates allowed Ravenell's race and sex discrimination claims based on "Harper's communications to Dougherty in the lead-up to the detail [to the Baltimore Field Office]" to proceed based on the "gravamen of Ravenell's entire complaint [being] that Harper was prejudiced against him." *Id.* at *11. Although the Secretary "argue[d] that it had a legitimate, nondiscriminatory reason for the detail," Judge Bates explained that "Ravenell is entitled to discovery before the Court rules on" that issue. *Id.* at *11 n.8. As to his hostile work environment claim, Judge Bates acknowledged that "the question is close," but concluded that Ravenell's "allegations are sufficient to plausibly state a hostile work environment claim at this early stage of the case." *Id.* at *12.

On May 22, 2024, the case was referred to this the undersigned after the parties consented to the jurisdiction of this Court. ECF No. 20. Following discovery, the Secretary moved for summary judgment on Ravenell's race and sex discrimination and hostile work environment claims. ECF No. 28. After an extended briefing schedule, that motion is now ripe for resolution.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party must demonstrate that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party must identify the absence of a genuine dispute as to a material fact, at which point the nonmoving party must respond with "specific facts showing that there is a genuine issue

for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *see* Fed. R. Civ. P. 56(c)(1). To survive a motion for summary judgment, the non-moving party "'may not rest upon mere allegation or denials of his pleadings' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57).

A court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013). And "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett*, 715 F.3d at 358 (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). As such, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013). Moreover, summary judgment motions in employment discrimination or retaliatory action cases warrant "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997)), *aff'd*, 818 F.3d 751 (D.C. Cir. 2016).

## III. DISCUSSION

As noted above, two of Ravenell's Title VII claims remain. The first asserts that he was subjected to impermissible race and sex discrimination "based on Harper's communications to Dougherty in the lead-up to [his] detail" to the Baltimore office. *Ravenell*, 2024 WL 1344460, at *11. The second asserts "a hostile work environment claim based on 'unlawful and inappropriate

verbal conduct' by Harper." *Id.* at *12. The Secretary moves for summary judgment on both claims. For the following reasons, the Court will grant the motion.

**A. Race and Sex Discrimination**

Ravenell's race and sex discrimination claims arise from his detail to the Baltimore office. In essence, Ravenell asserts that "Harper was prejudiced against [Ravenell] on account of his race and sex and that this discriminatory animus" colored "the way she described the June 2019 altercation to Dougherty," which in turn influenced Dougherty's decision to detail Ravenell to Baltimore. *Ravenell*, 2024 WL 1344460, at *11. Because Ravenell challenges the actions of his supervisor (Harper) rather than the ultimate decisionmaker (Dougherty), he relies on the "'cat's paw' theory of discrimination." *Id.* The Secretary responds that Ravenell has not identified evidence on which a reasonable factfinder could find in his favor on the cat's paw theory. ECF No. 28 at 14–19. The Court agrees.

Title VII prohibits "discrimination based on race, color, religion, sex, or national origin" in federal employment. 42 U.S.C. §§ 2000e-16(a). Where, as here, a Title VII plaintiff does not offer direct evidence of discrimination, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). At the first step of that framework, the plaintiff must establish a *prima facie* case by showing that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)); *see McDonnell Douglas*, 411 U.S. at 802. At the second step, once the plaintiff makes a *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the challenged action. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). If the employer does so, at step three the burden shifts

back to the plaintiff to prove that the proffered reason is a pretext for discrimination. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

Once the employer properly asserts a nondiscriminatory reason, the "central question" on summary judgment is whether the plaintiff "produced sufficient evidence for a reasonable jury to find that the employer's asserted" reason was pretextual "and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). The D.C. Circuit has thus recognized a "shortcut" to step three: When the employer provides "admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions," "the District Court 'need not—*and should not*—decide whether the plaintiff actually made out a prima facie case'" and should proceed to "merits resolution on the third prong." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087, 1092 (D.C. Cir. 2019) (quoting *Brady v. Off. of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

The "cat's paw" theory of liability requires straying slightly from that well-worn path. Courts have noted "the uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability." *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1151 (8th Cir. 2011). Integrating the cat's-paw standard into the *McDonnell Douglas* framework requires "re-fram[ing] the search for pretext under *McDonnell Douglas* [step three] to ask whether—based on all of the evidence—a reasonable jury could find that the plaintiff has met the three prongs of cat's-[p]aw liability." *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 362 n.4 (D.D.C. 2016), *aff'd*, 709 Fed. App'x 7 (D.C. Cir. 2017) (mem.); *accord Earle v. Atkins*, No. 19-cv-1419, 2026 WL 1261082, at *14–15 (D.D.C. May 8, 2026).

That theory takes its name from one of Aesop's fables, in which a monkey cajoles a cat into retrieving roasting chestnuts from a fire, every one of which the monkey eats, leaving the cat with nothing but a singed paw. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 415 n.1 (2011). By a loose analogy in the employment context, an employer may be liable where the "actions of a discriminatory supervisor . . . causally influence the decisionmaker's ultimate determination" to impose "an adverse employment action," making the decisionmaker the discriminatory supervisor's proverbial "cat's paw." *Steele v. Mattis*, 899 F.3d 943, 950–51 & n.4 (D.C. Cir. 2018). To prevail on a cat's-paw theory, the plaintiff must show that "[1] the supervisor perform[ed] an act motivated by discriminatory animus [2] that [was] intended by the supervisor to cause an adverse employment action, and [3] that act [was] a proximate cause of the ultimate employment action." *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citation modified) (quoting *Staub*, 562 U.S. at 422).

Understandably given "the uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability," *Diaz*, 643 F.3d at 1151, the parties' briefs evince some confusion about how those tests fit together. In essence, the Secretary contends, and Ravenell concedes, that the Secretary has asserted a legitimate, non-discriminatory reason for Dougherty's decision to detail Ravenell to the Baltimore office—to "allow the atmosphere to settle" after the incident between Ravenell and Harper. ECF No. 28-1, ¶¶ 51, 58; *see* ECF No. 32-1 at 16–17; ECF No. 32-2, ¶ 11. The Court thus takes the "shortcut" to the third step of *McDonnell Douglas*, which here is replaced by the three cat's-paw prongs. *See Figueroa*, 923 F.3d at 1087; *Brandli*, 209 F. Supp. 3d at 362 n.4. Construing their contentions liberally, the parties dispute whether "a reasonable jury could find that [Ravenell] has met the three prongs of cat's-[p]aw liability." *Brandli*, 209 F. Supp. 3d at 362 n.4.

The analysis begins (and ultimately ends) at the first prong—whether a reasonable fact-finder could conclude that Harper "perform[ed] an act motivated by discriminatory animus." *Morris*, 825 F.3d at 668. As may sound familiar: Where the employer proffers a nondiscriminatory reason for the supervisor's action, the question at summary judgment is "whether a reasonable jury could find that the non-discriminatory reason proffered for the supervisor's action was pretextual." *Duncan v. Johnson*, 213 F. Supp. 3d 161, 191–92 (D.D.C. 2016); *see also Morris*, 825 F.3d at 671–72; *Savignac v. Jones Day*, 754 F. Supp. 3d 135, 166–171 (D.D.C. 2024) (evaluating whether supervisor's professed nondiscriminatory motivation was "was dishonest or unreasonable" (quoting *Brady*, 520 F.3d at 496)).

The Secretary has asserted that Harper had "a legitimate, nondiscriminatory, clear, and reasonably specific" motivation for reporting the incident to Dougherty, *see Figueroa*, 923 F.3d at 1092—she believed Ravenell's behavior during the incident was insubordinate and physically threatening. ECF No. 28-1, ¶ 52; *see also* ECF No. 28-3 at 57; ECF No. 28-4, ¶¶ 20, 23. Ravenell does not dispute that this is Harper's professed motivation. ECF No. 32-1 at 12.

Harper's professed motivation, moreover, is buttressed by uncontroverted evidence showing that it was reasonable under the circumstances. As the D.C. Circuit has explained, where "the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495. Here, while Ravenell quibbles with some details of Harper's account, he concedes that his exchange with Harper occurred and became so heated that it left him "emotionally overwrought." ECF No. 32-2, ¶ 11. He admits that the exchange was fraught enough that he, too, felt the need to report it to Dougherty "immediately" after leaving Harper's office. *Id.*

And he does not dispute that other ICE employees who witnessed the exchange felt compelled to intervene to "deescalate the situation." ECF No. 28–3 at 79; *see also id.* at 20, 86.

Seeking to salvage his discrimination claims, Ravenell contends that Harper's professed motivation was a pretext for race- and sex-based discriminatory animus, which, he claims, led her to "trump[] up her description of the events in order to paint a picture of Mr. Ravenell as enraged, threatening, and a danger." ECF No. 32-1 at 23. The D.C. Circuit has recognized several types of evidence that may "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation," including that (1) "better treatment of similarly situated employees outside the plaintiff's protected group"; (2) "inconsistent or dishonest explanations"; (3) "deviation from established procedures or criteria"; (4) a "pattern of poor treatment of other employees in the same protected group"; or (5) "other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker*, 798 F.3d at 1092. Ravenell relies on three of those grounds. None suffices to survive summary judgment.

*First*, Ravenell claims that "he experienced different treatment from similarly situated individuals outside of his protected class." ECF No. 32-1 at 21. To succeed on this ground at the summary judgment stage, Ravenell must show that "all of the relevant aspects of his employment situation were nearly identical to those of" his proffered comparators. *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (citation modified) (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)); *see Joyner v. Morrison & Foerster LLP*, 140 F.4th 523, 530 (D.C. Cir. 2025). And he "must demonstrate that []he and the alleged similarly-situated employee[s] 'were charged with offenses of comparable seriousness.'" *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (quoting *Burley*, 801 F.3d at 301).

Here, Ravenell claims that Harper treated three of his white and/or female colleagues more favorably than him, including by, presumably, not subjecting them to similar "trump[ed] up" reports of misconduct. ECF No. 32-1 at 20–23. But as explained below, he has not shown that his putative comparators are similarly situated to him.

To start, Ravenell has not shown that "that all of the relevant aspects of his employment situation were nearly identical to those of" his colleagues. *Burley*, 801 F.3d at 301 (quoting *Holbrook*, 196 F.3d at 261). Besides noting that the three colleagues he identifies were white and/or female and worked in his unit, he provides no evidence showing that they had similar experience, seniority, expertise, "jobs[, or] job duties." *Burley*, 801 F.3d at 301; *see Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 7 (D.D.C. 2013) (evaluating "co-worker's experience, seniority, [and] expertise"). To the contrary, according to ICE's uncontroverted submission, two had different job titles—"Mission Support Specialist" and "Management and Program Analyst," whereas Ravenell was a "Detention and Deportation Officer," ECF No. 28-1, ¶¶ 4, 27, 31. And the third finds no mention at all in either of the parties' statements of material facts. So Ravenell has not provided evidence sufficient for a reasonable factfinder to find that his comparators were similarly situated to him. *See Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1175 (D.C. Cir. 2021) (affirming grant of summary judgment where comparators had "different ranks, titles, and job duties"); *Robb v. Rollins*, No. 20-cv-929, 2025 WL 1025084, at *14–15 (D.D.C. Apr. 7, 2025) (granting summary judgment where the plaintiff did "not provide *any* details of [a comparator's] job description, experience, education, or other qualifications" (citation modified)); *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *31 (D.D.C. Apr. 3, 2025) (similar).

Nor does Ravenell present any evidence that his colleagues "were charged with offenses of comparable seriousness." *Wheeler*, 812 F.3d at 1115 (quoting *Burley*, 801 F.3d at 301). He

does not cite any evidence showing that any of them were charged with similar misconduct—or, indeed, that they were charged with *any* misconduct. As a result, the fact that his colleagues avoided being the subject of similar reports by Harper is just as likely a result of their avoiding similar charges of misconduct as it is their race or sex. *See Furey v. Mnuchin*, 334 F. Supp. 3d 148, 163 (D.D.C. 2018) (granting summary judgment where plaintiff did "not provide evidence that any of the three [comparators] committed any 'offenses' at all"); *Duncan*, 213 F. Supp. 3d at 183–84 (similar).

Accordingly, Ravenell has not identified a similarly situated comparator whose better treatment could raise an inference of discriminatory animus.

*Second*, citing two statements about other ICE employees from January 2018, Ravenell claims that Harper "frequently made inappropriate comments about male employees." ECF No. 32-1 at 21. He avers that he witnessed Harper refer to one male employee "as Kim Jong Un" (he elsewhere clarifies that he did not view this comment as *racially* motivated because this particular employee is "not of Asian descent," ECF No. 32-5 at 22) and to another male employee "as having killed someone in a government vehicle [accident]" (he elsewhere acknowledges that this employee was, in fact, involved in a fatal car accident but states that the employee was not at fault, ECF No. 32-6 at 7). ECF No. 32-1 at 21. Neither raises the specter of discriminatory animus.

To begin, those two statements are neither "explicitly [sex-based] nor infused with [sex-based] undertones based on common usage." *Hairston v. Vance-Cooks*, 773 F.3d 266, 274 (D.C. Cir. 2014). Ravenell cannot "merely speculate[] that his supervisor[] acted with [discriminatory] animus during the incidents of which he complains." *Nurriddin*, 40 F. Supp. 3d at 119 (D.D.C. 2014). And the Court will "not infer discriminatory animus" from the statements themselves "if the words uttered are plainly lacking in [such] animus." *Hairston*, 773 F.3d at 274. Without more,

these facially sex-neutral comments—while potentially insensitive or offensive for other reasons—do not support an inference of sex-based discriminatory animus.

Ravenell contends that these statements demonstrate Harper's animus because he "never observed [Harper] making inappropriate comments about female employees." ECF No. 32-1 at 21. To be sure, a "pattern of poor treatment of other employees in the same protected group" can "raise an inference of unlawful discrimination." *Walker*, 798 F.3d at 1092. But two facially neutral comments over the course of a year and a half are hardly a "pattern," let alone a "pattern" sufficient "to raise an inference of unlawful discrimination." *Id.*; *see also Robb*, 2025 WL 1025084, at *15. Indeed, even a stray "*race-based* remark unrelated to the relevant employment decision cannot, without more, permit a jury to infer discrimination." *Morris*, 825 F.3d at 669 (emphasis added). Accordingly, two facially neutral, relatively "innocuous remarks 'unrelated to the relevant employment decision do not, without more, permit a reasonable jury to infer discrimination.'" *Sagar v. Mnuchin*, 305 F. Supp. 3d 99, 110 (D.D.C. 2018) (citation modified) (quoting *Morris*, 825 F.3d at 669), *aff'd*, No. 18-5183, 2019 WL 667201 (D.C. Cir. Jan. 29, 2019).

Ravenell also asserts in passing that Harper "would frequently circumvent" the Black male acting director in her chain of command. ECF No. 32-1 at 21. Neither Ravenell's opposition to the motion for summary judgment nor his deposition testimony, which his opposition cites, provides any factual support for this statement, such as examples of Harper circumventing the acting director. *See* ECF No. 32–5 at 77. Nor does he explain the basis of his personal knowledge of incidents that presumably would not have involved him. And it appears that circumventing the Black male acting director would also require Harper circumventing her white female immediate supervisor, Dougherty, who reported to the acting director. *See* ECF No. 28-1, ¶¶ 7–9. Ravenell's "reliance on vague, unsupported statements" about circumvention therefore does support an

inference of discriminatory "animus . . . sufficient to survive a summary judgment motion." *Coakley-Simelton v. Georgetown Univ.*, No. 18-cv-2014, 2020 WL 4569423, at *12 (D.D.C. Aug. 7, 2020).

Thus, Ravenell has not shown that a pattern of poor treatment of others within his protected class raises an inference of discriminatory animus.

*Third*, Ravenell claims that Harper's account of the incident "shifted over time[,] presenting an inference of pretext." ECF No. 32-1 at 22–23. Ravenell claims that Harper "did not initially allege that she feared for her safety" when reporting the incident to Dougherty the day of the incident but later "that evening . . . began sharing that she feared for her safety." *Id.* at 23. To raise an inference of discriminatory animus, conflicting statements must be "sufficiently inconsistent as to be 'probative of pretext.'" *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 398 (D.C. Cir. 2020) (quoting *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011)). But "minor variations" and "fine descriptive differences between materially consistent accounts, without more, do not tend to make the accounts unworthy of belief, let alone support an inference of discrimination." *Walker*, 798 F.3d at 1094.

As an initial matter, the details of Harper's reports of the incident are somewhat murky. Ravenell cites only Dougherty's declaration, which states that Dougherty first heard of the incident when Harper called her the day of the incident and "relayed . . . the incident that happened between herself and Ravenell." ECF No. 28-4 at 35–36, ¶ 20. Doughtery does not recount the details of Harper's statement at this time. "Later that evening," after Dougherty spoke with Ravenell, "Harper contacted [Dougherty] and told [Dougherty] that upon further reflection, she believed she was subject to a hostile work environment during the altercation with Mr. Ravenell." *Id.* at 36–37, ¶ 23. Harper stated that "she feared for her safety and that Mr. Ravenell had been physically

intimidating during their verbal altercation though no physical contact had occurred." *Id.* Based on these statements in Doughtery's declaration, a reasonable factfinder could infer that Harper added that she feared for her safety in her second statement on the evening of the incident.

Even so, Harper's explanations "s[a]ng the same tune," namely, that she and Ravenell engaged in a heated exchange in her office. *See Oviedo*, 948 F.3d at 399. The fact that Harper feared for her safety is not *inconsistent* with her description of the event—the exchange was contentious. *Compare id.* (finding no inconsistency despite one explanation's "fail[ure] to explicitly reference" details included in another explanation), *with Steele*, 899 F.3d at 950 (finding inconsistency where explanation "evolv[ed] from unexplained silence, to performance-based complaints, to an insistence that the budget and *definitely not* [the plaintiff's] performance issues drove the decision"). That is especially so here, where the first statement was made in the heat of the moment and the second was made mere hours later, before the adverse action had been taken and any allegation of discrimination had been made. Accordingly, Ravenell has not shown that a reasonable factfinder could conclude that Harper's explanations were "sufficiently inconsistent as to be 'probative of pretext.'" *Oviedo*, 948 F.3d at 398 (quoting *Geleta*, 645 F.3d at 413).

All this is not to say that the Court disbelieves Ravenell's version of events and credits Harper's—it does not. Rather, the Court finds that Ravenell has not borne the burden of proof that all plaintiffs bear at summary judgment. *See Nessar v. District of Columbia*, 962 F. Supp. 2d 234, 242 (D.D.C. 2013) ("Summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." (citation modified) (quoting *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008))). It is not enough at this stage of the proceedings for Ravenell to show that he was Black and "male and treated poorly." *Beachner v. Howard Univ.*, No. 25-7058, 2026 WL 2071133, at *2

(D.C. Cir. July 17, 2026) (per curiam). Rather, to avoid summary judgment, he must produce evidence sufficient for a reasonable jury to find that his poor treatment was "based on" his "race" and/or "sex." 42 U.S.C. § 2000e-16(a); *see Morris*, 825 F.3d at 668. Judge Bates prudently concluded that Ravenell's claim was plausible enough to permit him "discovery before the Court rules on" whether he could shoulder that burden at summary judgment. *Ravenell*, 2024 WL 1344460, at *11 n.8. Now, having completed discovery, the Court concludes that he cannot. Because that forecloses his claims for race and sex discrimination, the Court will grant the Secretary's motion for summary judgment on these claims.

**B. Hostile Work Environment**

The Secretary also moves for summary judgment on Ravenell's hostile work environment claim. ECF No. 28 at 19–22. To survive the Secretary's motion, Ravenell must show that he was "subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To carry that burden, Ravenell marshals twelve "instances of unwelcome harassment" by Harper. ECF No. 32-1 at 26. The Secretary does not dispute his liability for Harper's actions should they be sufficient to constitute a hostile work environment. *See Ayissi-Etoh*, 712 F.3d at 577–78. The Secretary instead argues that the instances Ravenell proffers are insufficient to do so. The Court agrees.

The standard for a hostile work environment is "demanding." *Nichols v. Young*, 248 F. Supp. 3d 1, 9 (D.D.C. 2017). Title VII is neither a "general civility code" nor a panacea for the "ordinary tribulations of the workplace." *Id.* (citation modified) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)). To be sufficiently severe or pervasive, "conduct must be extreme" enough "to amount to a change in the terms and conditions of employment." *George v.*

*Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting *Faragher*, 524 U.S. at 788). That is judged on "the totality of the circumstances, 'including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.'" *Moore v. Carson*, 322 F. Supp. 3d 163, 169 (D.D.C. 2018) (quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). And beyond being severe or pervasive, the conduct "must be *discriminatory*." *Jenkins v. District of Columbia*, 281 F. Supp. 3d 77, 88 (D.D.C. 2017). "[H]ostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." *Id.* (quoting *Na'im v. Clinton*, 626 F. Supp. 2d 63, 73 (D.D.C. 2009)).

The lion's share of the conduct Ravenell invokes plainly has "no connection to [his] protected status[es]"—his race and sex. *See Arero v. Lake*, 804 F. Supp. 3d 106, 130 (D.D.C. 2025), *appeal filed*, No. 25-5413 (D.C. Cir. Nov. 19, 2025). Nine of the twelve incidents on which Ravenell relies fall within this category:

- "On or about November 27, 2018, Ms. Harper responded to Mr. Ravenell in a text message stating 'the f***ing address on the fact sheet is wrong'";
- "In January 2018, Ms. Harper . . . made a comment to Mr. Ravenell referring to a colleague . . . as Kim Jong-un";
- "On or about January 22, 2018, Ms. Harper made a reference to Mr. Ravenell that a colleague . . . (Black, male) had killed someone in a government vehicle";
- "Ms. Harper repeatedly criticized Mr. Ravenell's use of telework and leave," which appears to refer to Harper's interference with his use of telework from December 2017 to June or July 2018 and her comments about his use of leave on March 8, 2019, and June 14, 2019;
- "On December 6, 2018, Ms. Harper criticized Mr. Ravenell on a phone call with Senior Detention and Deportation Officers ("SDDO"), and kicked him off of the call";
- "On June 20, 2019, Ms. Harper criticized Mr. Ravenell's work performance in front of other team members";

- "On or about May 17, 2019, Ms. Harper suggested that Mr. Ravenell apply for the SDDO job in Baltimore";
- "Ms. Harper advised Filed Offices Juvenile Coordinators ('FOJC') that Mr. Ravenell was 'here for you 24 hours a day'"[5]; and
- "On October 14, 2019, Plaintiff was not selected for the Section Chief position in the Juvenile and Family Residential Management Unit."

ECF No. 32-1 at 18–19; *see also id.* at 26. Attempting to avoid that conclusion, Ravenell again argues that several similarly situated employees outside his protected classes were not subjected to such treatment. *Id.* at 26. But that argument fares no better here than it did above. *See* Section III.A, *supra*. And without "some linkage between the hostile behavior and [Ravenell's] membership in a protected class," this conduct does not support a hostile work environment claim. *Jenkins*, 281 F. Supp. 3d at 88 (quoting *Na'im*, 626 F. Supp. 2d at 73); *see also Beachner*, 2026 WL 2071133, at *2 (affirming dismissal where plaintiff "pleaded no facts connecting th[e] alleged conduct to his race or sex"); *Arero*, 804 F. Supp. 3d at 130 (granting summary judgment based on "lack of evidence connecting [employer's] behavior to [plaintiff's] protected status").

Even if there were some connection between these events and Ravenell's race or sex, none of them, alone or in combination, was sufficiently severe or pervasive to create a hostile work environment. Rather, they are exactly "the kind of conduct courts frequently deem uncognizable under Title VII." *Baird v. Gotbaum*, 792 F.3d. 166, 171 (D.C. Cir. 2015). For instance, courts have found nonactionable a supervisor "criticiz[ing the plaintiff], undermin[ing] his authority, exclud[ing] him from meetings, and threaten[ing] discipline," *Beachner*, 2026 WL 2071133, at *2;

[5] This incident does not appear in either party's statement of material facts. Rather, Ravenell mentions it for the first and only time in the argument section of his opposition to the Secretary's motion for summary judgment, which cites his deposition testimony. ECF No. 32-1 at 19 (quoting ECF No. 32-5 at 32). At his deposition, Ravenell testified that he felt singled out by Harper because she would "end[] all her meetings" with Field Office Juvenile Coordinators by assuring them that "'[i]f you guys have issues, [Ravenell] is here for you 24 hours a day.' Not that [Harper's unit] is here for you 24 hours a day. Not that the [Deportation and Detention Officers] are here for you 24 hours a day. 'Eric is here for you 24 hours a day.'" ECF No. 32-5 at 32. Even considering this fact to be properly asserted, it fails to carry his burden for the reasons stated.

"occasional name-calling, rude emails, lost tempers and workplace disagreements," *Baird*, 792 F.3d. at 171; "selective enforcement of a time and attendance policy," *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014); "profanity-laden yelling" and "sporadic verbal altercations or disagreements," *Baloch*, 550 F.3d at 1199; "supervisors severely understaffing [the plaintiff's] unit, setting unreasonable deadlines and excessive work hours, and excluding [the plaintiff] from critical meetings," *Warren v. Kennedy*, No. 25-cv-1880, 2026 WL 1983627, at *9 (D.D.C. July 9, 2026); "non-selection for a desirable position, assignment to undesirable duties," "being accused of violating a telework policy, and not being acknowledged in meetings," *Gorecki v. Bondi*, No. 24-cv-3168, 2026 WL 890413, at *8 (D.D.C. Mar. 31, 2026) (citation modified) (quoting *Brooks v. Gundman*, 851 F. Supp. 2d 1, 6 (D.D.C. 2012), *aff'd* 748 F.3d 1273 (D.C. Cir. 2014); and "'impossible' deadlines, lowered performance evaluations, denial of training, and criticism," *Davila v. Mayorkas*, No. 22-cv-357, 2023 WL 2072455, at *9 (D.D.C. Feb. 17, 2023) (quoting *Jimenez v. McAleenan*, 395 F. Supp. 3d 22, 36 (D.D.C. 2019)). The "volume of [Ravenell's] allegations does not change [that] conclusion: a long list of trivial incidents is no more a hostile work environment than a pile of feathers is a crushing weight." *Baird*, 792 F.3d at 172.

Somewhat more compelling are the three remaining incidents—all statements with "racial overtones" purportedly made by Harper. ECF No. 32-1 at 26. First, while discussing her son's desire to attend an HBCU, Harper "either referred to the school as ghetto or the area in which it was located as ghetto." ECF No. 32-2, ¶ 7; *see also* ECF No. 28-1, ¶ 13. Second, on a different occasion but also in reference to her son's college plans, Harper "asked [Ravenell] if he was in a fraternity and if he had brands" and added that she did not want to her son to be branded given that "it has a slave connotation." ECF No. 32-2, ¶ 10; *see also* ECF No. 28-1, ¶¶ 14–17. Third, "it was suggested to [Ravenell] from [a coworker] that Ms. Harper told [a different coworker] that

[Ravenell's] girlfriend and him were not together when she became pregnant," which, Ravenell says, conjures negative stereotypes about Black men. ECF No. 32-2, ¶ 8. Although these statements inch closer to the line, they do not cross it.

As an initial matter, Harper's comment about Ravenell's relationship status does not carry Ravenell's burden for two reasons. First, Ravenell fails to support it with admissible evidence. Ravenell cites his own response to the Secretary's interrogatory in which he recounts the statement. ECF No. 32-1 at 19 (citing ECF No. 32-6 at 6). But Harper's statement to a coworker (hearsay), known by some unexplained means to a second coworker (likely hearsay), relayed by the second coworker to Ravenell (hearsay), then relayed by Ravenell is "hearsay within hearsay." *Davis v. Yellen*, No. 08-cv-447, 2021 WL 2566763, at *36 (D.D.C. June 22, 2021). And even if Harper's initial statement may be admissible (which Ravenell makes no attempt to show), the second coworker's statement to Ravenell is hearsay, and the conveyance of Harper's statement from the first coworker to the second may add an additional layer of hearsay. *See* Fed. R. Evid. 805. Ravenell "may not rely on hearsay to overcome a motion for summary judgment." *Davis*, 2021 WL 2566763, at *36; *see also Gleklen v. Democratic Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000) (explaining "sheer hearsay" at summary judgment "counts for nothing"); *accord Jones v. Off. of the Architect of Capitol*, No. 21-cv-0990, 2025 WL 858267, at *11 (D.D.C. Mar. 19, 2025).

Second, this comment was not made to Ravenell. "When discriminatory statements are not made directly to a plaintiff, generally a hostile environment cannot be established." *Cooper v. Nielson*, 298 F. Supp. 3d 197, 204 (D.D.C. 2018) (citation modified) (quoting *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005)). Courts have thus concluded that "this type of second-hand gossip may be unprofessional and unpleasant to hear, but it lacks the severity or pervasiveness

necessary to affect the terms or conditions of employment and to give rise to an environment that is subjectively and objectively hostile." *Clemmons v. Acad. for Educ. Dev.*, 107 F. Supp. 3d 100, 117 (D.D.C. 2015); *accord Doe 1 v. George Washington Univ.*, 369 F. Supp. 3d 49, 71 n.14 (D.D.C. 2019). So too here. This statement—made outside Ravenell's presence and communicated to him only through another coworker—does not create a hostile work environment.

That leaves Harper's alleged description of a historically Black university as either "ghetto" or located in the "ghetto" and her reference to fraternity brands as having "a slave connotation." While lacking tact, these remarks are not sufficiently severe to create a hostile work environment. Unlike other forms of racially offensive comments found to be sufficiently severe, these comments did not target Ravenell directly. For instance, the D.C. Circuit has suggested that calling an employee a "deeply offensive racial epithet" may constitute a hostile work environment. *Ayissi-Etoh*, 712 F.3d at 577. But courts have found the use of a racial epithet insufficient where it was not directed at the plaintiff. *See Arero*, 804 F. Supp. 3d at 130 (finding use of ethnic slur insufficient where "there [wa]s no evidence that [the employer] used the slur against [the plaintiff]"); *Grays v. Noem*, No. 24-cv-1809, 2025 WL 2643421, at *7 (D.D.C. Sep. 25, 2025) (same); *cf. Harris*, 510 U.S. at 21 ("[M]ere utterance of an epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII." (citation modified)). Here, Harper did not refer to Ravenell as "ghetto" nor associate him directly with slavery. Rather, both statements, especially in context, focus on her son and the environment in which he would attend college.

And in any event, these comments are a far cry from the "deeply offensive" remarks that make a work environment hostile. *See Ayissi-Etoh*, 712 F.3d at 577. To the contrary, these comments fall within the bounds of distasteful, insensitive, and even offensive remarks that courts have

found insufficiently severe. *See Grays*, 2025 WL 2643421, at *2, *7 (finding "two instances in which a coworker made a derogatory comment about Jewish people"—"What is wrong with Jews?" and "fucking Jews"—insufficiently severe); *Toomer v. Mattis*, 266 F. Supp. 3d 184, 196–97 (D.D.C. 2017) (concluding that "asking an African-American person, 'Do you think of yourself as a monkey?' when that person is complaining about an ape- or monkey-like action figure displayed in the workplace is insensitive and offensive" but "not *sufficiently* severe to constitute a racially hostile work environment"). Indeed, courts have found that even referring to an employee as "ghetto" "may be distasteful but does not create a hostile work environment." *Montgomery v. McDonough*, 682 F. Supp. 3d 1, 12 (D.D.C. 2023); *accord Okojie v. Metro. Nashville Hosp. Auth.*, 584 F. Supp. 3d 543, 560 (M.D. Tenn. 2022).

Nor are two such comments over the course of a year and a half sufficiently pervasive. "Generally, courts are reluctant to infer unlawful discrimination on the basis of 'stray remarks' in the workplace." *Hyson v. Architect of Capitol*, 802 F. Supp. 2d 84, 99 (D.D.C. 2011); *see also Freedman v. MCI Telecomm. Corp.*, 255 F.3d 840, 848 (D.C. Cir. 2001) ("[A] singular stray comment does not a hostile environment make."). Courts have thus concluded that a handful of incidents over a course of years is not pervasive enough to make a work environment hostile. *See Doe #1*, 554 F. Supp. 3d at 111 (concluding that "two isolated incidents over the span of four years" was "not pervasive abuse"); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (finding that "five discrete acts over the two-year period as well as infrequent inappropriate comments and staring" did not create a hostile work environment). The same is true here: Two comments in nearly as many years is not pervasive.

In sum, Ravenell identifies a number of ways in which Harper may not have been "a perfect boss" and ICE "may not have been a model workplace." *Arero*, 804 F. Supp. 3d at 131. But there

is a long distance between that conduct and "'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ayissi-Etoh*, 712 F.3d at 577 (quoting *Harris*, 510 U.S. at 21). Because Ravenell has not demonstrated the latter, the Court will grant the Secretary's motion for summary judgment on his hostile work environment claim.

## IV. CONCLUSION

Accordingly, the Court will grant the Secretary's motion for summary judgment.

A separate Order will issue.

Date: August 25, 2026

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE